UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ISRAEL LOPEZ, | Case No.: 1:19-cv-00643-LJO-JLT (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| STU SHERMAN, | [TWENTY-ONE DAY OBJECTION DEADLINE] |
| Respondent. | |

Petitioner is currently in state prison serving a sentence of thirty-eight years for his conviction for three counts of residential robbery in concert, two counts of first degree burglary, and one count each of carjacking, felon in possession of a firearm, extortion, criminal threats, dissuading a witness, and conspiracy. He filed the instant habeas petition challenging the conviction. As discussed below, the Court finds the claims to be without merit and recommends the petition be **DENIED**.

I.      **PROCEDURAL HISTORY**

Petitioner stands convicted of three counts of residential robbery in concert, two counts of first degree burglary, and one count each of carjacking, felon in possession of a firearm, extortion, criminal threats, dissuading a witness, and conspiracy. (Doc. 16 at 10.) He is serving an aggregate prison sentence of thirty-eight years. Id.

The Fifth DCA noted that the case primarily concerned the admissibility of evidence in light of and People v. Sanchez (2016) 63 Cal.4th 665, which was decided while the appeal was pending.

1

_People v. Lopez_, 2018 Cal. App. Unpub. LEXIS 7177, at *1 (Cal. App. 5th Dist. October 19, 2018). Petitioner further alleged ineffective assistance of counsel and sentencing error on appeal. _Id_. The Fifth DCA concluded that the _Sanchez_ claims had merit and warranted reversal of the gang participation convictions and related enhancements, and that Petitioner was subject to retrial on those charges. _Id_. at *1-2. The Fifth DCA additionally concluded that three duplicative counts of conviction for first degree robbery must be vacated and dismissed, and the remaining verdicts would stand. _Id_. at *2. Accordingly, the Fifth DCA affirmed in part, reversed in part, and remanded for further proceedings. _Id_.

Petitioner filed the instant habeas petition on May 9, 2019. (Doc. 1.) Respondent filed its answer on August 6, 2019. (Doc. 16.)

## II.   FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[1]:

Defendant was charged in a consolidated information with offenses committed against three victims during two separate incidents. As to events involving J.A. (victim 1), he was accused of first degree robbery in concert (Pen. Code, §§ 211, 212.5, subd. (a), 213, subd. (a)(1)(A); counts 1 & 8); carjacking (§ 215, subd. (a); count 2); residential burglary (§§ 459, 460, subd. (a); count 3); carrying a loaded firearm as an active gang member (§ 25850, subd. (c)(3); count 4); possession of a firearm by a convicted felon (§ 29900, subd. (a); count 6); and active participation in a criminal street gang (§ 186.22, subd. (a); count 7). Codefendants James Delacruz, Adrian Hernandez, and Frank Simental were also charged in counts 1-4 and 7-8. Count 5 alleged a violation of section 422 (criminal threats) by codefendant Hernandez only. Gang enhancement allegations (§ 186.22, subd. (b)) were included in counts 1, 2, 3, 6, and 8. Firearm enhancement allegations (§ 12022.53, subds. (b), (e)(1)) were included in counts 1, 2, and 8.

As to events involving T.C. (victim 2) and M.L. (victim 3), defendant and codefendant Delacruz were charged with first degree robbery in concert (counts 9-12); extortion of victim 2 by threat of injury (§§ 518, 519; count 13); residential burglary (count 14); carrying a loaded firearm as an active gang member (count 15); making criminal threats against victim 2 (count 16); attempting to dissuade a witness (victim 2) by means of force or fear (§ 136.1, subd. (c)(1); count 17); conspiracy to commit robbery (§ 182, subd. (a)(1); count 18); and active participation in a criminal street gang (count 19). Gang enhancement allegations were included in counts 9-14 and 16-18. Firearm enhancement allegations were included in counts 9-12 and 18.

---

[1] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts. _Moses v. Payne_, 555 F.3d 742, 746 (9th Cir. 2009).

Defendant was further alleged to have suffered a prior strike and serious felony conviction (§§ 667, subds. (a), (c)-(j), 1170.12, subds. (a)-(e)) and to have served two prior prison terms (§ 667.5, subd. (b)). The recidivism allegations were found true in a bifurcated bench trial. Defendant and codefendant Delacruz were jointly tried on the remaining charges before separate juries in August and September 2015. Codefendants Hernandez and Simental reportedly pleaded out of the case in July 2015.

***Prosecution Case***

## Counts 1-8

Victim 1 lived at an apartment complex in Delano. On July 12, 2014, four male intruders kicked open his front door and entered the residence. One person stood near the doorway while another roamed the apartment. The other two men, respectively armed with a knife and a gun, accosted the victim and demanded money and a vehicle. After threatening him with bodily harm, they took $40 in cash and the keys to a truck owned by his friend, M.Q., which was parked outside. The group departed with the money, the keys, and the victim's cell phone, warning they would kill him if he reported the incident.

Frightened by the ordeal, the victim remained in his living room for an extended period of time. When he finally looked outside, he saw the truck was missing. He borrowed a neighbor's phone to call M.Q. and told him about the robbery. M.Q. came to his apartment and, once there, called 911. During the call, the dispatcher asked if any of the perpetrators' identities were known. M.Q. relayed this question to the victim and repeated his answer to the dispatcher: "Israel Lopez." Later that day, while speaking with Officer Leonel Santos of the Delano Police Department, victim 1 again referred to defendant by name and identified him from a photographic lineup as the gunman.

On July 13, 2014, police located M.Q.'s truck along a road near the county border. Codefendant Hernandez was seen walking away from the vehicle. He was accompanied by two females, including a woman named Lisa Esparza. They were questioned and released, but police arrested Hernandez and defendant later that afternoon. Victim 1 identified Hernandez from a photographic lineup the same day. One of Hernandez's shoes was later matched to an imprint found on the victim's apartment door.

On July 15, 2014, victim 1 provided a detailed account of the robbery in a video-recorded interview with Michael Strand, a Delano police officer and gang investigator. He again claimed to have recognized defendant, identifying him by name, and said he saw one of the other robbers in his neighborhood the following day, July 13. The victim provided a physical description of this person, estimating he was 20 years old, and stated a relative had told him his name was James Delacruz. Victim 1 later identified codefendant Delacruz, then age 18, from a photographic lineup.

Victim 1 also told Officer Strand the defendant was a reputed "Northerner," i.e., a Norteño gang member. He denied any personal involvement with gangs and claimed he knew defendant from childhood but had not seen him since their days of attending elementary school together. The latter assertion was untrue. Defendant, then age 30, was

nearly 11 years younger than him and could not have been his schoolmate in grade school.

In a subsequent interview, victim 1 admitted to having had a tense encounter with defendant a decade earlier, circa 2004. At the time, defendant mistakenly believed victim 1 was a gang member who had moved into the area "to run the North." Defendant pulled a knife on him and said, "if anybody takes over Delano it's going to be [me]." Third parties intervened, and the misunderstanding was peacefully resolved.

On July 31, 2014, victim 1 attended a preliminary hearing and testified against Delacruz, Hernandez, and defendant. He identified Delacruz as the lookout, Hernandez as the person with the knife, and defendant as the gunman. During the hearing, defendant allegedly glared at him and either he or Hernandez made a slashing gesture across his throat. Victim 1 later told Officer Strand that defendant's brother, Adrian Garner, tried to intimidate him in the courthouse hallway. Garner had allegedly "made an aggressive gesture" and, while looking at victim 1, "put a scalpel on his face."

In August 2014, fingerprints lifted from M.Q.'s stolen truck were matched to Lisa Esparza and codefendant Simental. Simental was charged on August 29, 2014.

In September 2014, during a recorded conversation with Officer Strand, victim 1 claimed an anonymous caller had instructed him to prepare a notarized letter retracting his allegations against defendant. He was also told not to return to court. The caller warned that he and his family members would be killed if he disobeyed.

In July 2015, victim 1 was jailed for failure to comply with a trial subpoena. When he testified the following month, he proved to be a reluctant and dubious witness. Victim 1 denied knowing defendant or recognizing him as one of the robbers. He also denied implicating him in earlier stages of the case. Portions of his testimony were impeached and refuted by the recorded police interviews, a transcript of the 911 call, and through the testimony of Officers Santos and Strand. Amid further conflicting testimony, victim 1 confirmed defendant's involvement in the robbery.

On cross-examination, victim 1 acknowledged two notable details. Besides the truck and his own property, the robbers had stolen a tablet computer belonging to one of his relatives, A.A. They had also asked him, "Where is the dope?" As will be explained, the portrayal of victim 1 as a drug dealer was an important part of the defense case.

**Counts 9-19**

On or about July 13, 2014, another home invasion robbery occurred in Delano. The victims did not initially report the crime. However, in one of his conversations with Officer Strand, victim 1 mentioned being told "there had been another home invasion by the same people." On August 20, 2014, Officer Strand located victim 2 and questioned him about the rumored incident.

Officer Strand made an audio recording of his first meeting with victim 2. Victim 2 confirmed he was robbed and, when asked who did it, said, "[S]ome guy named Isr[ael] and uh, 3 of his friends. [¶] ... [¶] ... I didn't report it or anything like that. He said don't report it. And now these guys, they don't mess around, so I was afraid of a bullet." He noted one of the robbers, "some kid," had pointed a gun at his head.

Following a brief conversation at his home, victim 2 accompanied Officer Strand to the police station for a video-recorded interview. According to his statements, the incident occurred on a Sunday morning, around 8:00 a.m., and began with someone attempting to kick open his front door. He looked out a window and saw people walking away. Minutes later, a female friend inside the apartment, victim 3, unlocked or opened the front door and the intruders came inside. He suspected victim 3 knew the perpetrators and implied she must have been complicit in the robbery since she had opened the door.

When the robbers entered the apartment, one of them pointed a revolver at victim 2. Defendant, although not the gunman, "did all the talking." He instructed both victims to keep their heads down and told victim 2, "'You work for us now.'" Victim 2 interpreted this to mean defendant was under the mistaken impression that he was a drug dealer. The robbers looked through the residence and left with a cell phone and a laptop computer.

The robbers attempted to mask themselves with their shirts, but victim 2 recognized defendant and caught a glimpse of another person's face. He had met defendant on prior occasions and told Officer Strand, "There's just no mistaking him." Victim 2 described defendant as "kind of stocky[,] like he lifts weights," and noticeably older than the other robbers, whom he characterized as "youngsters, [in their] early 20s."

Victim 2 identified codefendant Delacruz from a photographic lineup. However, when identifying the person he knew as "Israel," he selected a photograph of defendant's brother, Adrian Garner. The record describes defendant and his brother as having similar facial features but different physiques. According to testimony by Officer Strand, defendant's brother was approximately "five-foot-six" and had a "medium to thin build." Defendant was five inches taller and "built heavy like a weight lifter."

In October 2014, Officer Strand contacted victim 2 to conduct additional photographic lineups. Victim 2 became upset, making references to "Northerners" and saying "this wasn't supposed to happen." He refused to cooperate further, but apparently identified another eyewitness to the crime, S.R.

At trial, victim 2 testified to most of the facts set forth in his police interviews. He added details regarding two female witnesses, S.R. and R.R., and claimed to now believe S.R. had been responsible for opening his apartment door prior to the robbery. Victim 2 further testified that S.R. had introduced him to someone named Israel a few days prior to the incident. She later warned him, based on her conversations with Israel, that "some guys ... are going to probably rob you." (Full capitalization omitted.) After being asked to look at defendant and Delacruz in court, victim 2 denied recognizing them. He admitted defendant has a "stocky build" and "look[s] like he lift[s] weights."

In December 2014, Officer Strand located and interviewed S.R. at her home. Her account of the incident began in early July 2014, when she was staying at victim 2's apartment as a guest. Defendant came to the residence approximately one week prior to the robbery. S.R. answered the door and was surprised to see defendant, whom she knew but had not seen since he was a boy. Defendant was nine years younger than her and had been a childhood friend of her late brother-in-law.

Defendant told S.R. he was looking for victim 2 and that her presence "put a wrench in [his] program." He then explained victim 2 was rumored to be dealing drugs. S.R. knew of defendant's gang ties and had a general understanding or belief that Northerners "tax" drug dealers. S.R. assured him victim 2 was merely a user, not a dealer. He replied, "'Well, ... just make sure he know, you know, don't be sellin' nothin', 'cause if I find out he's sellin' somethin', then I'm gonna come back.'"

Victim 2 came home in the middle of S.R.'s conversation with defendant. She introduced them to each other and victim 2 went inside, leaving S.R. and defendant alone on the front porch. Next, defendant told S.R. he needed money and asked if she could broker a loan from victim 2. She spoke with victim 2 and he agreed to lend defendant $40. At S.R.'s insistence, defendant left his iPod as collateral. He repaid the loan within 48 hours, and she returned his iPod. The robbery occurred a few days later.

Recalling the crime, S.R. said she was awakened by the sound of someone pounding on the apartment door. Victim 2 looked outside and made a remark about "gangsters runnin' up the alley." Victim 3 and a third woman, R.R., were also present. A few minutes later, S.R. exited the apartment and saw four or five people making a "b[ee]line" for the door. She recognized defendant and told him, "Don't you dare hurt [victim 2]." Defendant said "it wasn't his call, but he wasn't going to hurt him," and proceeded into the apartment. She remained outside until the group exited. They "scattered" while fleeing the scene.

When S.R. went back inside, she found her purse upturned and discovered her cell phone was missing. Angered by the theft of her new phone, she ran out of the apartment in pursuit of the robbers. She "chased [defendant] down" and demanded her phone. He said to her, "'Come on—come on, just be [quiet]. Just don't be loud. Don't be crazy. ... We'll go get your phone right now.'" S.R. walked with him "down to the end of the street" and saw people "scattering in and out of [a] house." She recognized three people from the robbery. Defendant went up to one of them and said, "'Give her back her phone,'" which he did.

S.R. was later told that victim 3 "was step-sister to one of the people that were involved." The information came from an "older Northerner" with whom S.R. had discussed the robbery. She believed the information to be credible given this person's status. He told her the robbery "wasn't ordered by some bigger Northern person[;] it was them acting out on their [own]" because the big Northerners "don't do home invasions, ... that's not their thing anymore." He also claimed to have heard there was "somebody that was feeding [them] information from the inside," referring to victim 3 or possibly R.R.

According to Officer Strand's testimony, victim 3's step-brother is a "well documented"

Norteño. Moreover, he was with defendant at the time of his arrest, just hours after the robbery. Officer Strand interviewed victim 3 but apparently obtained no fruitful information. She did not testify at trial.

At the conclusion of his interview with S.R., Officer Strand asked her to review a series of photographs and tell him if she recognized "anybody from the invasion." S.R. verbally identified defendant and pointed to his picture, but she declined to circle the photo or confirm her identification in writing. She explained the reluctance: "[Defendant] knows who all was there, 'cause I was there. He knows I was there, and, you know, if—if I'm being, um, subpoenaed to court to go to some trial, or anything like that, that's gonna put me in a bad situation ...."

S.R. was later jailed for failing to comply with a trial subpoena. When she took the witness stand, her testimony closely tracked the story told to Officer Strand, but nearly all details tending to incriminate defendant were omitted or revised. In particular, she claimed defendant's assistance in recovering her stolen phone occurred because he happened to be in the neighborhood at the time, not because he was involved in the robbery. She denied ever having implicated him in the crime.

Unbeknownst to S.R., Officer Strand had secretly recorded their conversation. She did not learn of the recording's existence until it was used to impeach her testimony at trial. The entire interview was played for the jury, including S.R.'s statements during the lineup procedure. Nevertheless, she maintained defendant was not involved in the robbery and that she had fortuitously met up with him while chasing the actual perpetrators. In another new twist, she described those individuals as being "flamed up," i.e., dressed in red clothing. Defendant, in contrast, allegedly "looked like he was going to work."

R.R. was the last witness to be contacted by Officer Strand. A friend and neighbor of victim 2, she acknowledged being present during the robbery and identified defendant from a photographic lineup. Months later, shortly before her trial appearance, she received death threats in connection with the case. The first threat was made by an anonymous caller. The second threat came from a person who showed up at her house as she was leaving for court.

At trial, R.R. testified to leaving the apartment with S.R. just before the robbers entered and waiting outside until they departed. The four intruders attempted to mask themselves with their shirts, but she saw enough of defendant's face to identify him. When she went back inside the apartment, victim 2 was shaking with fright. Victim 3 "was acting calm," but seemed upset over the purported theft of her MP3 player.

R.R. described defendant as having a large chest, and she responded affirmatively when asked if he "was bigger than the rest of them." She testified he wore red, and claimed the other three had on white T-shirts. Unlike the other witnesses, R.R. identified defendant in court as one of the robbers. The reporter's transcript indicates defendant was "shaking his head no" when R.R. made the identification.

### *Post-arrest Statements and Jail Calls*

On July 13, 2014, defendant was arrested at the home of a friend named Kendall Pile. Those present included codefendant Hernandez, Lisa Esparza, and the step-brother of victim 3. A search of the residence uncovered a loaded revolver. Pile denied ownership of the gun or prior knowledge of its existence.

Defendant made the following statements to police during the booking process, in the presence of codefendant Hernandez:

"Sir, this is crazy, whoever did this better tell the truth. Everyone knows I don't steal cars. That's not my thing.... [¶] ... [¶] [M]y mom should have let me borrow the damn car. ... If she would have let me borrow the car, I would not be here right now. [¶] ... [¶]

"... I was at my house with my brother Adrian Garner, and he told me that someone had called him and told me I had an hour to return the truck. ... I know I would have returned the truck. I was planning on going to who I think I knew had the truck and return it. And whoever said it was me that took the truck probably saw me in the area of where it happened and automatically thought it was me, and they must have got me confused with someone else." At some point defendant turned to Hernandez and asked, "[Do] you know anything about what's going on?" When Hernandez did not respond, defendant called him "lame." He also predicted Hernandez would "PC up," i.e., enter protective custody, when he arrived at the county jail.

Defendant made several recorded telephone calls from jail, many of which were played for the jury. On July 21, 2014, he called his wife and was informed the police had come to his family's home to take pictures of their car. He said, "[T]hey must have video of—of the car, which is good. If they have video of the car, then they're gonna see that I—that wasn't me. [¶] ... [¶] *Plus I was with you all that whole day.*" (Italics added.) The People argued the italicized statement was an attempt to manufacture one of several conflicting alibis for the robbery of victim 1.

On July 24, 2014, defendant spoke with Kendall Pile about testifying on his behalf: "Hey man, you know I'm going to need you for my defense brother because they're trying to say that—remember we went over there and dropped them fools off? They're trying to say that I fucking—that—that I got out of the car .... But I need you to be my—I mean you're my witness, boy. I never even got out of the God damn car." Pile agreed, saying he would "tell the truth[,]" "[b]ecause you didn't get out of the car fool. You were right in the car the whole time." Later that evening, defendant spoke to his wife about the case: "[I]t's all circumstantial evidence, baby. They didn't even caught me in possession of anything .... [¶] ... [¶] For one, I didn't do nothing. I've got a good defense, dude, because, like I said, I got all of you guys—witness testified that I'm—that I—that I was at home... [¶] ... [¶] I got a alibi. I was at home."

On July 25, 2014, defendant spoke to A.A., a relative of victim 1. Although she referred to him as her uncle during the call, victim 1 testified they are second cousins. A.A. told defendant she was very upset over the theft of her tablet computer from victim 1's

apartment. Defendant proclaimed his innocence: "Your uncle is lying .... I swear to God ... when I went over there, look, I dropped somebody off over there .... When he looked out the window, he seen me. And he's lyin'—he's lyin' about all this ...."

Defendant told A.A. that he and Kendall Pile drove codefendants Delacruz and Hernandez to victim 1's apartment but left before anything happened. He became aware of the incident after victim 1 contacted a third party, who in turn called defendant's brother and said "they wanted their truck back." Allegedly, Hernandez later claimed victim 1 had agreed to loan him the truck for one hour and called the police when he failed to return it on time.

A.A. asked defendant if the reason he was in jail was because of the incident involving victim 1. He confirmed it was, and she said, "I thought it was with—with [victim 2] [¶] ... [¶] [w]ith the white guy." Defendant replied, "No. It was ... for home invasion and ... carjacking." A.A. had been surprised to learn of the allegations regarding victim 1, "because everybody was saying that it was ... with some white boy [victim 2]." Defendant referred to victim 2 as a "white guy" during his trial testimony, but denied knowing what A.A. was talking about at the time of the call. During closing argument, the People noted the significance of A.A. alluding to defendant's involvement in the robbery of victim 2.

On August 8, 2014, defendant spoke to his mother about obtaining work records corresponding to "the date that ... the thing supposedly took place." The next day, he called his wife and told her "Frankie," i.e., codefendant Simental, had been "busted." He asked his wife to look up the charges against Simental, and she reported it was felony possession of a controlled substance. Defendant reacted by saying, "Oh, is that .... That's it?" Simental was later charged with the robbery of victim 1, but he had not been identified as a suspect at the time of this call.

On August 10, 2014, defendant called A.A. and further accused victim 1 of lying about his involvement in the robbery. He claimed victim 1 held a grudge against him over an incident from years earlier. Defendant told A.A. to speak with "Ivan" about what had happened at the "Travel Inn" between him, victim 1, and the truck owner, M.Q.

From August 3-13, 2014, defendant made multiple calls to Deputy Christian Melero of the Kern County Sheriff's Department. Defendant was a confidential informant for the sheriff's department, and Deputy Melero was his primary "handler." During one of the calls, defendant asked the deputy for help negotiating a "deal" with the prosecutor. Declaring himself to be a "gang expert," defendant said he was willing to do "whatever it takes ... to get myself out of this situation." He added, "I ain't with this gang bullshit but I, I mean, so whatever it takes ...whatever he wants to know about whatever ... I know there, all there is to know about everything."

On August 13, 2014, Deputy Melero told defendant he had talked to the prosecutor and there would be no deal. The main problem, according to the deputy, was victim 1 had already testified against him at the preliminary hearing. Defendant asked, "What did they say if the victim doesn't, doesn't go to court, didn't go to court anymore?" Deputy

Melero said it didn't matter, and he ended the conversation by saying, "[Y]our people gotta fuckin' tell this dude, I'm telling you, they got to tell this fuckin' dude to put that shit on paper somehow. [¶] ... [¶] ... Either you gotta tell your defense attorney or he's gotta fuckin' tell somebody man 'cause that [¶] ... [¶] ... shit needs to be put on paper 'cause that shit ain't looking good bro, I'm telling you." Within minutes of this call, defendant contacted his family members and asked for their help obtaining a notarized statement from victim 1 retracting his allegations.

### Gang Evidence

Officer Strand served as the People's gang expert. He attested to the existence of a criminal street gang called the Norteños and opined defendant was an active member at the time of the robberies. We provide a detailed summary of the gang evidence in our Discussion, *post*.

### Defense Case

Beginning in approximately 2012, defendant earned money as a confidential informant for the Kern County Sheriff's Department. The arrangement required him to make "controlled buys" of illegal narcotics. Such purchases were made under police supervision and typically documented with a hidden recording device. From May 2014 until his arrest two months later, defendant was also employed by a farm labor contractor as a field worker.

### Counts 1-8

Defendant testified on his own behalf. His version of events was an amalgam of three alibis outlined in the jail calls. On July 11, 2012, the day *before* the first robbery, Kendall Pile allegedly drove defendant, Delacruz, and Hernandez to victim 1's apartment. Delacruz and Hernandez were dropped off for the purpose of buying drugs. When they knocked on the victim's door, someone inside looked out the window and may have seen defendant in the car. Pile and defendant drove away, not waiting to see if Hernandez and Delacruz were let into the apartment. This testimony accounted for the jail call with Pile and their statements about defendant being "in the car the whole time."

Defendant denied victim 1's story about their alleged argument in 2004. He testified the first encounter of any significance was at a motel in 2005, when defendant and a person named Ivan attempted to rob victim 1 and M.Q. of illegal drugs. In defendant's words: "A friend and I got wind that there was some individuals breaking down dope, a lot of dope, and a lot of meth, and so we went, and so we staked the place out a little bit, and sure enough, we saw [M.Q.] exit the room ...." They ambushed M.Q. in the parking lot, then "escorted him back to the motel room where we witnessed [victim 1] breaking down 20 pounds of meth." Instead of stealing the entire stash as they had planned, Ivan only took eight pounds and negotiated a "business deal" with them. "[F]rom that point on, Ivan purchased his meth from [M.Q.]." The testimony suggested M.Q. was connected to the Sinaloa drug cartel.

In 2012 or early 2013, defendant ran into M.Q. and victim 1 again at the home of another drug dealer named Mike. Mike "was waiting for his connection to come drop off some dope," and the suppliers turned out to be them. The ensuing transaction involved a pound of methamphetamine.

In 2014, defendant attempted to "get closer" to victim 1, hoping to eventually make a controlled buy and receive a payout from the sheriff's department. He implemented the plan by allegedly having codefendant Delacruz buy narcotics from victim 1 on multiple occasions. On July 11, 2014, defendant "was trying to see if [victim 1] [w]ould sell drugs to Adrian Hernandez as well, so [defendant] could get closer to [M.Q.] for the purpose of informing Christian Melero that these people were selling drugs."

The defense produced a sign-in sheet from defendant's farm labor employer to prove he worked on July 12, 2014, the date of the robbery. The document showed a 6:00 a.m. arrival time, but, unlike defendant's sign-in sheet from the previous day, it did not indicate the hour of his departure. Defendant testified to working from 6:00 a.m. to 2:30 p.m., and arriving home at approximately 3:30 p.m. His sister, Cynthia Estrada, provided corroborating testimony. She attested to driving defendant to and from the job site, working beside him from 6:00 a.m. to 2:30 p.m., and also eating lunch with him during a 30-minute break. Defendant's former brother-in-law, Humberto Ortiz, testified to seeing defendant and his sister leave for work around 5:00 a.m. and return home between 3:30 and 4:00 in the afternoon.

M.Q. called 911 at 2:31 p.m. on July 12, 2014, to report the robbery of victim 1. Therefore, if defendant was at work from 6:00 a.m. to 2:30 p.m., he could not have participated in the crime. However, defendant's testimony adopted as true his statements to police about learning of the robbery from his brother. As told at trial, victim 1 and/or M.Q. had called a third party and instructed that person to contact defendant or his brother "and tell them that if they didn't bring the truck back within the hour, they were going to call the cops." Defendant further explained, "I was going to ask my mom if I could use the car, so I could go look for Adrian Hernandez wherever he was, but she wouldn't let me use her car. She said, you have nothing to do with whatever they are saying, so just stay your butt home, and that's what I did."

According to victim 1's trial testimony, he waited at least one hour before calling M.Q. to inform him about the stolen truck, and more time elapsed before M.Q. came over and called 911. Based on defendant's work alibi, he would have been at his job site when the victims issued their one-hour deadline, not at home asking his mother for permission to use her car. He supposedly arrived home at 3:30 p.m., a full hour *after* the victims had reported the incident to police. Defendant's testimony did not account for this discrepancy.

Defendant also failed to explain why, in the earliest jail calls, he claimed to have been at home with his wife the entire day. He testified to working six days that week, alleging his only day off was Sunday, July 13, 2014. The initial alibi could not have been in reference to July 13, however, because he testified to spending most of Sunday at the home of Kendall Pile and also visiting someone who lived near victim 2 (see *post*).

11

**Counts 9-19**

Defendant's alibi for the second robbery generally matched the trial testimony of S.R. To give further context to S.R.'s story, defendant testified as follows:

"[M]y friend Kendall Pile, he told me that he knew a female [i.e., witness R.R.] who lived down the street that could get some dope from somebody who lived behind her [i.e., victim 2]. [¶] ... [¶] ... [M]e and my friend Kendall went over there, and I went over there to see the purpose of this guy selling drugs, and I gave [R.R.] some money behind the alley, and she came back with some dope. And I said okay, bingo, here's somebody selling [who I can report to Deputy Melero]."

Following the alleged transaction with R.R., defendant attempted to make direct contact with victim 2:

"[S]ince I had already gained information that [victim 2] was selling drugs, I went over there to go see if I could buy some, you know, so that I can inform that to [Deputy Melero]. When I knocked on the door, [S.R.] answered. And I know [her]. She was my childhood friend, my childhood best friend's sister-in-law, so it surprised me, oh, [S.R.], you're here? You know, that's when I started asking her, hey, does this guy sell drugs? You know what I mean? Trying to buy some. [¶] ... [¶]

"... I had lied to her, and I told her I was there on behalf of the Northerners, right, which is my way of hiding the fact that I'm over there for the sheriff's department. And I [asked if victim 2] was selling drugs? She told me no, he doesn't sell drugs, he uses drugs, and he has a lot of females over here and stuff like that .... So I was, like, I tried to get it out of her some other way, and say, well, here, I got an iPod, and do you think he can give me some drugs. He doesn't have any drugs, and he [*sic*] left and came back with $40 cash."

On July 13, 2014, defendant visited Kendall Pile "early in the morning" to help him "do[] stuff around his house." Pile lived on the 1300 block of 9th Avenue. Later, the two of them went to see someone who lived near victim 2, close to the 1300 block of 11th Avenue. Defendant's testimony placed him at this location during the robbery:

"[W]e were there just conversating with [Pile's] friends and getting some cigarettes. And out of nowhere, I seen [S.R.] running up the street, and she's saying, hey, hey, and I look over at her, and I'm like what's going on? And right after she does that, right next to this house that we're at on the corner of Madison, and I want to say 10th, some kids come running out down the alley, and a few of them run that way, and one of them runs across the street, jumps the fence, and one of them comes right towards where we were ... and that's [when] she said, hey, that guy got my phone ...."

Consistent with the testimony of S.R., defendant claimed to have assisted her in recovering the stolen phone. He denied recognizing the "kid" who had taken it or any of the other suspects.

### *Gang Allegations*

Defendant admitted to prior involvement in gang activity as a teenager and in early adulthood. He had been part of a graffiti "tagging crew" called Youth Gone Wild and became a Norteño gang member. However, he allegedly transitioned to "inactive" status at the age of 21, circa 2005. According to his testimony, there are important distinctions between active Norteños, inactive Norteños, and so-called dropouts: "[A] dropout basically goes into protected custody. An active Norteno participates in all the gang functions on the streets and behind the walls. An inactive Norteno participates in none of the functions on the streets or behind the walls[,] [¶] ... [¶] [b]ut is still in general population." Dropouts are also in danger of being harmed by active members.

In 2007 and 2008, defendant attempted to drop out of the Norteños but was urged to remain an inactive member. He admittedly continued to engage in some criminal behavior, but it was no longer gang related. Inactive Norteños "might commit crimes, but they don't commit them for the benefit of a gang, they commit it for themselves."

After changing his Norteño status from active to inactive, defendant tattooed over a five-point star on his chest, converting the image into a heart. The original tattoo was supposedly an homage to his mother's Texas roots (connoting the Lone Star State), but he altered it because Norteños identify with the same imagery and prison officials had interpreted it as having a gang-related meaning. Defendant also had tattoos of the word "Delano" across his stomach and tributes to deceased friends and family members. All of his tattoos, including the converted star image, predated the charged offenses by several years.

### *Verdicts and Sentencing*

Defendant was acquitted of carrying a loaded firearm as alleged in counts 4 and 15. He was otherwise convicted as charged and all enhancement allegations were found true. The trial court imposed an aggregate prison sentence of 110 years to life, plus 17 years, calculated as follows: consecutive terms of 30 years to life for the robbery convictions on counts 1, 9, and 10, each further enhanced by a five-year term for his prior serious felony; a consecutive term of 20 years to life for witness dissuasion (count 17); and consecutive one-year terms for each prison prior. Punishment for the remaining convictions and findings was stayed.

Lopez, 2018 Cal. App. Unpub. LEXIS 7177, at *2-31.

## III.   DISCUSSION

### A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to

the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the

United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.

13

7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.    Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-06).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of

fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C.     Review of Petition

Petitioner raises the following claims in his petition: (1) Petitioner claims that the prosecution's gang expert testimony disclosing testimonial hearsay violated the Confrontation Clause; (2) Petitioner argues that his trial counsel rendered ineffective assistance by failing to object to portions of Officer Strand's interview with S.R.; (3) Petitioner alleges a Miranda violation based on the admission of statements he made to Officer Strand during a probation compliance check; and (4) Petitioner contends that the cumulative effect of the errors deprived him of due process.

///

15

1.    <u>Gang Expert Testimony</u>

Petitioner argues that the prosecution's gang expert testimony disclosing testimonial hearsay violated the Confrontation Clause. In the last reasoned decision, the Fifth DCA denied the claims as follows:

> Defendant assigns error to the admission of certain testimony by the People's gang expert. Most of his claims are governed by the now familiar *Sanchez* decision, and we must decide issues of forfeiture, admissibility, and prejudice. For following reasons, we reject the People's forfeiture argument, accept the concession that some evidence was admitted in violation of state law and defendant's constitutional rights, and conclude the errors were prejudicial in relation to the section 186.22 convictions and gang enhancement findings. We reject defendant's argument the errors impacted the remaining verdicts.

> In a related claim, defendant alleges a violation of his Fifth Amendment rights as interpreted by *Miranda v. Arizona* (1966) 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (*Miranda*). The question presented is whether his admission of gang affiliation during a probation search was the product of custodial interrogation. The issue is effectively moot in light of our reversal for *Sanchez* error, but it may recur on remand. Therefore, we reach the merits of the claim and ultimately find no error.

> **A. Additional Background**

> Officer Strand's qualifications as a gang expert are not disputed. According to his testimony, the terms Norteños and Northerners refer to members of a criminal street gang whose primary activities include "murder, attempted murder, vehicle theft, robbery, home invasions, assault with a deadly weapon, narcotic sales, drive-by shootings, arson, witness intimidation, grand theft, burglary, kidnapping, torture, extortion, vandalism, carjacking, firearm related offenses and criminal threats." Norteños identify with the color red and often have tattoos signifying their gang affiliation. Such tattoos include a five-point star and the grouping together of four dots.

> Norteños are part of a criminal enterprise controlled by the Nuestra Familia prison gang. There is an organizational hierarchy and a code of conduct known as the "14 bonds." Norteños must respect the chain of command and obey the 14 bonds, one of which prohibits cooperation with law enforcement, e.g., being an informant. Members commit crimes to benefit the gang, generally to enhance its reputation for violence (thereby instilling fear in the community) or to provide financial support. Those involved in drug trafficking and other remunerative criminal activities must give a portion of their proceeds to the gang, which is known as paying a "tax."

> To establish the "pattern of criminal gang activity" required by section 186.22 (see further discussion, *post*), Officer Strand testified to the details of seven qualifying felonies committed by alleged Norteño gang members. Certified court records established the identities of those convicted of each offense. To prove the crimes were

gang related and committed by Norteños, the People relied on Officer Strand's opinion testimony, which was based on a mix of hearsay sources and personal knowledge.

Officer Strand's opinions regarding the gang-related nature of the charged offenses and defendant's status as an active Norteño were also based on a mix of hearsay and nonhearsay evidence. To better frame the issues of error and prejudice, our summary of this evidence is divided into three categories: (1) testimony supported by personal knowledge or independent proof; (2) testimony not supported by personal knowledge or independent proof; and (3) Officer Strand's rebuttal testimony, which contained both.

### 1. Testimony supported by personal knowledge or independent proof

In April 2009, defendant contacted police regarding the theft of a laptop computer. The investigating officer, Heriberto Trigo, testified to his statements: "He mentioned that he was a member of the Northern structure prison gang and he feared retaliation for seeking police assistance with regards to his missing property." Officer Strand later testified to having read the corresponding police report: "[Defendant] was reluctant to give out more information, because of repercussions that the gang would instill upon [him]. And [defendant] admitted that he was a member of the Northern structure." Although the report was hearsay, defendant's statement was properly admitted through the testimony of Officer Trigo, who was subject to cross-examination. (See Evid. Code, § 1220 [party statements exception to hearsay rule].)

In October 2013, Officer Strand spoke with defendant during a probation compliance check at his home. He recounted to the jury parts of their conversation: "Having known some of [defendant]'s history, I asked [defendant] if he was ever going to stop being a Norteno? And he said, no. And I asked him, why he would never leave the Norteno gang? And I distinctly recall [defendant] saying that it was safer to stay in the gang, and this was significant to me, because [defendant] admitted to me that he was a Norteno, and he had no intention of leaving the gang, because it's safer to stay a gang member."

Officer Strand took into account defendant's contacts with other gang members. Codefendant Simental, following his arrest in this case, admitted to Officer Strand his membership in a Norteño "subset" called Varrio Delano Locos. Simental also had four dots tattooed on his hand, "a common sign or symbol of the Norteno gang." Codefendant Hernandez had tattoos of four dots on his hands and face, and a "red YB tattoo on his forearm," which the expert interpreted as a reference to a Norteño subset called the Young Bucks. Codefendant Delacruz's tattoos included multiple five-point stars, which "are symbols of the Norteno gang and indicate[] that somebody [has] committed a hit."

Like defendant, Simental and Hernandez had tattoos of the word "Delano." Officer Strand found this significant because "gang members will oftentimes tattoo where they are from, because they are territorial." He discounted defendant's alteration of his own five-point star tattoo, explaining "it's not uncommon for gang members to cover up or try to conceal their identity with the gang."

The expert further relied on the trial evidence:

"Home invasion is one of the gang's primary activities[,] as well as burglary[,] criminal threats[,] firearm offenses and witness intimidation, robbery, so those—those crimes are consistent with the gang's primary activities. I also found it significant that [defendant]'s three other codefendants are gang members from different subsets.... [W]e have Nortenos from different sets cooperating with each other in these crimes.... [¶] ... [¶] [A]nd there was testimony from victims and witnesses about Nortenos taxing people which is also consistent with the Norteno culture and various illegal activities."

### 2. Testimony not supported by personal knowledge or independent proof

Officer Strand testified to the contents of approximately 12 police reports, plus "bookings, classifications, ... and other material" pertaining to defendant's criminal history. We summarize this evidence in chronological order.

In February 2002, defendant was arrested on suspicion of vehicular burglary. He wore a red shirt and was carrying a switchblade knife. He was charged with brandishing a knife and possession of an illegal weapon. In June 2002, during a booking in Tulare County, he admitted to associating with the "North" on a jail classification questionnaire.

In April 2005, defendant was assaulted by four members of the Sureño gang, a rival of the Norteños. In June 2005, during a traffic stop, he was found in possession of a "narcotics pipe" and a loaded handgun. An alleged "Norteno associate" was also in the car.

In July 2007, defendant fled the scene of a traffic stop. The passenger in his car was an alleged Norteño gang member. A month later, defendant was contacted by police with another Norteño gang member. The latter incident resulted in charges of "possessing a controlled substance, resist and delay, obstruct[ing] a peace officer[,] conspiracy[,] visiting a location where narcotics are sold, and possession of marijuana." In September 2007, defendant was contacted in a car occupied by several Norteño members and associates. A search of the vehicle yielded a "zip gun," i.e., a homemade firearm.

In March 2008, defendant was arrested on suspicion of commercial burglary. He and other alleged Norteños were contacted during a traffic stop and found in possession of the stolen items. In July 2009, at approximately 4:00 a.m., defendant and a Norteño dropout were detained on suspicion of prowling. Defendant was carrying a butterfly knife. In October 2012, defendant was allegedly "charged with possession of marijuana for sale, ... possession of stolen property and possession of a dirk or dagger."

In August 2013, at approximately 5:00 a.m., Delano police officers responded to a report of an attempted home invasion. Upon arrival, officers saw defendant (clad in a red shirt) "running from the same apartment" and learned a Norteño dropout had been stabbed inside the residence. Defendant and two "active Norteno gang members" were charged with burglary and conspiracy.

In July 2014, following defendant's arrest in this case, Kern County jail officials found

a "kite" inside a Norteño housing pod. According to Officer Strand, "Kites are paperwork with Norteno messages .... This kite, in particular, had what's called a new arrival questionnaire. A new arrival questionnaire goes along with Bond No. 6, any and all information concerning new arrivals will be reported through the proper channels."

The kite was shown to the jury in a Power Point presentation and Officer Strand recited some of its contents. In reference to defendant, the kite said, "The following individual has been granted a full clearance to our beloved casa [house]. Do please embrace him with open arms, with abundance of love, honor and respect in full to our lovely establishment." Officer Strand testified, "It's significant, because it shows [defendant] being cleared in a kite. He's listed as a member of Youth Gone Wild, a subset of Nortenos, and his moniker, date of birth, and other information were included on that paper." Officer Strand also claimed "reliable sources" had said defendant was in charge of a subset called Way of Life, which had "absorbed" Hernandez's subset, the Young Bucks, by 2011 or 2012.

Elsewhere in his testimony, Officer Strand alleged the existence of a different kite. "We have evidence Nuestra Familia member Jose Velez[,] they call him Cisco[,] [who's] from Delano and became a member of the Nuestra Familia and sent another kite to another Norteno in Delano with orders to form a squad to shut down drug houses and to tax the existing drug houses." He repeated this allegation when opining about the gang-related nature of the case, adding, "if somebody comes in with this hypothetical and demands dope, I think it's fair to assume that the Nortenos believe that that was a dope house."

Lastly, the expert related hearsay from police reports concerning Delacruz. Delacruz was allegedly arrested twice for burglary in 2010. In May 2014, he admitted to associating with Northerners on a jail classification questionnaire.

### 3. Officer Strand's rebuttal testimony

The People elicited rebuttal testimony to impeach two defense witnesses. Defendant's sister had denied being a gang member. She admitted to previously acknowledging a Norteño association "[f]or safety reasons, when I went to jail," but later equivocated about the nature of her booking admission. When asked about gang tattoos, she denied having four dots on her wrist and said, "It's three dots." The former brother-in-law, Humberto Ortiz, also denied being a gang member or associate.

Officer Strand opined defendant's sister was a gang member: "I reviewed an arrest from 2006 when she was arrested for forgery and counterfeit. She had in her booking photos four dots tattooed on her left wrist. The arresting officer made a note that said, quote, four dots next to the picture, and I reviewed another arrest from 2008 where she had four dots tattooed on her wrist again, and I also contacted Central Receiving Facility in 2011, and she was classified as a North when asked, do you belong or associate with any gang in or out of jail? [¶] ... [¶] [H]er AKA is Sad Eyes."

Regarding Humberto Ortiz, the expert testified: "I reviewed his AKA of—and found out

that it was Enemy, and that's his moniker when he was arrested in July of 2005, and he was classified as North at CRF, the same question, do you belong to or associate with any gang in or out of jail? If yes, who? And the answer was North. And I also reviewed a field interview from 2012 where he was contacted with two gang members .... [¶] ... [¶] He's at the minimum affiliated with the Norteno gang."

## B. Applicable Law

Section 186.22 proscribes the substantive offense of active participation in a criminal street gang, as set forth in subdivision (a), and includes enhancement provisions, which are found in subdivision (b). (*People v. Elizalde* (2015) 61 Cal.4th 523, 538-539, 189 Cal. Rptr. 3d 518, 351 P.3d 1010.) The elements of the offense are: "First, active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; second, knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and third, the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130, 150 Cal. Rptr. 3d 533, 290 P.3d 1143.) The enhancement provisions apply when a felony is committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b).)

A criminal street gang is "any ongoing organization, association, or group of three or more persons ... whose members individually or collectively engage in or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).) "A gang engages in a 'pattern of criminal gang activity' when its members participate in 'two or more' statutorily enumerated criminal offenses (the so-called 'predicate offenses') that are committed within a certain time frame and 'on separate occasions, or by two or more persons.'" (*People v. Zermeno* (1999) 21 Cal.4th 927, 930, 89 Cal. Rptr. 2d 863, 986 P.2d 196.) The list of qualifying offenses is found in section 186.22, subdivision (e)(1)-(33). The gang's primary activities must include at least one of the enumerated crimes. (§ 186.22, subd. (f).)

"Expert testimony is admissible to establish the existence, composition, culture, habits, and activities of street gangs; a defendant's membership in a gang; ... the 'motivation for a particular crime, generally retaliation or intimidation'; and 'whether and how a crime was committed to benefit or promote a gang.'" (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1120, 120 Cal. Rptr. 3d 251 (*Hill*).) Until recently, experts were permitted to recite out-of-court statements upon which they had relied in forming their opinions even if the statements were otherwise inadmissible under the hearsay rule. Case law held such evidence was not offered for its truth, but only to identify the foundational basis for the expert's testimony. (E.g., *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1210, 30 Cal. Rptr. 3d 582 (*Thomas*).) Pursuant to this rationale, appellate courts deemed the use of out-of-court statements in an expert's "basis testimony" to be compliant with the hearsay rule and the requirements of *Crawford v. Washington* (2004) 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (*Crawford*). (*People v. Valadez* (2013) 220 Cal.App.4th 16, 30, 162 Cal. Rptr. 3d 722.)

In *Sanchez*, the California Supreme Court determined a trier of fact must necessarily consider expert basis testimony for its truth in order to evaluate the expert's opinion, which implicates the hearsay rule and the constitutional right of confrontation. (*Sanchez, supra*, 63 Cal.4th at p. 684.) "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay.... If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Id.* at p. 686, fn. omitted.)

A gang expert cannot testify to case-specific facts asserted in hearsay statements unless such facts are within the expert's personal knowledge or independently supported by admissible evidence. (*Sanchez, supra*, 63 Cal.4th at pp. 676, 684-685.) Factual assertions are "case-specific" if they relate "to the particular events and participants alleged to have been involved in the case being tried." (*Id.* at p. 676.) Federal constitutional issues arise if case-specific facts are presented in the form of testimonial hearsay. (*Id.* at pp. 680-681, 685.) "Testimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony." (*Id.* at p. 689.) Information contained in a police report is generally construed as testimonial hearsay because police reports "relate hearsay information gathered during an official investigation of a completed crime." (*Id.* at p. 694.)

The erroneous admission of testimonial hearsay is reviewed for prejudice under the standard described in *Chapman v. California* (1967) 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (*Chapman*). (See *Sanchez, supra*, 63 Cal.4th at pp. 670-671, 698.) The People must show, beyond a reasonable doubt, that the error did not contribute to the jury's verdict. (*Sanchez*, at p. 698.) The erroneous admission of nontestimonial hearsay is a state law error, which is assessed for prejudice under *People v. Watson* (1956) 46 Cal.2d 818, 299 P.2d 243. (*Crawford, supra*, 541 U.S. at p. 68; *People v. Duarte* (2000) 24 Cal.4th 603, 618-619, 101 Cal. Rptr. 2d 701, 12 P.3d 1110.) Where there is a combination of federal and state law hearsay errors, the reviewing court applies the *Chapman* standard. (See *Sanchez*, at p. 698; accord, *People v. Martinez* (2018) 19 Cal.App.5th 853, 861, 228 Cal. Rptr. 3d 271 ["Because the instant case involves a mix of testimonial and nontestimonial hearsay, we will apply the federal standard"].)

## C. Forfeiture

This case went to trial in August 2015. The *Sanchez* opinion was issued in June 2016. Despite intervening changes in the law, the People allege forfeiture because defendant "failed to raise any hearsay or confrontation clause objections in the trial court."

"Reviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence." (*People v. Welch* (1993) 5 Cal.4th 228, 237, 19 Cal. Rptr. 2d 520, 851 P.2d 802.) There is a split of authority on the question of forfeiture in cases involving pre-*Sanchez* trial proceedings. (Compare *People v. Flint* (2018) 22

Cal.App.5th 983, 996-998, 231 Cal. Rptr. 3d 910 [*Sanchez* claim not forfeited] and *People v. Jeffrey G.* (2017) 13 Cal.App.5th 501, 507-508, 221 Cal. Rptr. 3d 88 (*Jeffrey G.*) [same] with *People v. Blessett* (2018) 22 Cal.App.5th 903, 925-941, 232 Cal. Rptr. 3d 164, rev. granted Aug. 8, 2018, S249250 (*Blessett*).) The issue is currently pending before the California Supreme Court. (*Blessett, supra*, S249250; *People v. Perez* (2018) 22 Cal.App.5th 201, 231 Cal. Rptr. 3d 316, rev. granted July 18, 2018, S248730.)

*Jeffery G.*, which appears to represent the majority view, reasons that hearsay and confrontation clause objections to expert testimony would have been futile in the pre-*Sanchez* era because the doctrine of stare decisis required trial courts to overrule them. (*Jeffrey G., supra*, 13 Cal.App.5th at pp. 507-508.) The opinion notes *Sanchez* expressly disapproved of six prior state Supreme Court decisions, including *People v. Montiel* (1993) 5 Cal.4th 877, 21 Cal. Rptr. 2d 705, 855 P.2d 1277 (*Montiel*) and *People v. Gardeley* (1996) 14 Cal.4th 605, 59 Cal. Rptr. 2d 356, 927 P.2d 713 (*Gardeley*). (*Jeffrey G., supra*, at pp. 506-507 & fn. 4.) In *Montiel*, the high court endorsed the use of jury instructions advising "that matters admitted through an expert go only to the basis of his opinion and should not be considered for their truth." (*Montiel*, at p. 919.) The *Gardeley* opinion held that experts could recite hearsay if it constituted "material of a type that is reasonably relied upon by experts in the particular field in forming their opinions." (*Gardeley*, at p. 618.)

The opposing view on forfeiture, as expressed by the majority of a divided panel in *Blessett*, scrutinizes the foreseeability of changes in the law. The opinion explains how the holdings of *Sanchez* were foreshadowed by *Crawford, Williams v. Illinois* (2012) 567 U.S. 50, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (plurality opn.), the concurring and dissenting opinions in *People v. Dungo* (2012) 55 Cal.4th 608, 147 Cal. Rptr. 3d 527, 286 P.3d 442, and two appellate court decisions, *Hill* and *People v. Mercado* (2013) 216 Cal.App.4th 67, 156 Cal. Rptr. 3d 804. (*Blessett, supra*, 22 Cal.App.5th at pp. 930-932.) Despite the precedential import of *Gardeley*, all notions of futility were rejected: "Had defendant made the objection in the trial court, the prosecution would have been on notice of the need to establish the nonhearsay, nontestimonial nature of the statements upon which the gang expert relied if it could, or perhaps determine whether the expert could base his opinion solely on matters that were not hearsay and not testimonial." (*Blessett*, at p. 933.) In essence, *Blessett* concludes objections are never futile so long as changes in the law are "reasonably foreseeable." (*Id.* at p. 936.)

Here, although trial counsel could have been more proactive, we believe the *Sanchez* claim was preserved for appellate review. As we explain, the key issues were raised through motions in limine. Therefore, we need not decide whether more pointed objections would have been futile.

### 1. Procedural background

The People filed a trial brief citing *Gardeley* as authority for an expert's ability to "reveal the information on which he relied, including hearsay that may otherwise be

inadmissible." A subsequent heading stated, "The Principles of Confrontation as Outlined in *Crawford* Do Not Limit the Gang Expert's Ability to Rely on Out-of-Court Statements as the Basis for His Opinion." (Boldface and some capitalization omitted, italics added.) Within this section, the People cited and quoted *Thomas, supra*, 130 Cal.App.4th at page 1210 for the proposition that *Crawford* was not at odds with *Gardeley* and the "established rule that ... the materials on which the expert bases his or her opinion are not elicited for the truth of their contents ...." The People also quoted *People v. Ramirez* (2007) 153 Cal.App.4th 1422, 1427, 64 Cal. Rptr. 3d 96 (citing *Thomas*, at p. 1210): "Hearsay in support of expert opinion is simply not the sort of testimonial hearsay the use of which *Crawford* condemned."

Codefendant Delacruz filed a written motion in limine entitled "Motion ... to Exclude/Limit Gang Evidence and Request for an Evidence Code Section 402 Hearing." (Boldface and some capitalization omitted.) The motion sought "an order excluding and/or limiting the testimony of any witnesses whom the prosecution intends to call at trial to testify as experts regarding the behavior and membership in street gangs and ... an Evidence Code section 402 hearing so that the counsel and the court might be in better position to limit the scope of the gang evidence." The motion was made, inter alia, on grounds the anticipated evidence "would exceed the permissible scope of expert testimony, and would deprive the defendant of ... the right to confront witnesses" as guaranteed by the state and federal Constitutions.

The legal arguments in the codefendant's motion were responsive to those asserted in the People's trial brief. The *Hill* opinion, which questioned the continuing validity of *Gardeley* and *Thomas*, was cited and discussed. (*Hill, supra*, 191 Cal.App.4th at pp. 1129-1137 & fn. 18 ["There is some reason to believe that the California Supreme Court may be prepared to recognize the logical error in *Gardeley* and *Thomas*"].) Defense counsel observed that testimonial statements are "factually assertive statements which are difficult if not impossible to disregard for their truth." This is, of course, the basic holding of *Sanchez* and its reason for overruling the *Gardeley* line of precedent. (*Sanchez, supra*, 63 Cal.4th at p. 684.) Next, the briefing pointed out that neither *Gardeley* nor *Thomas* "addressed whether the hearsay basis evidence in the cases before them was testimonial," and argued, "*Hill* appropriately criticized the assumption underlying *Thomas* and *Gardeley*—that juries will be able to consider hearsay statements as basis evidence without regard for their truth or falsity ...."

Defendant's motions in limine contained a written joinder to "co-defendants' in limine motions where said motions appropriately benefit his defense." His trial counsel also made an oral joinder when the motions were heard. During the hearing, the trial court asked, "[I]s there anything specific that somebody believes is [objectionable]—even if it's only used for the basis of the officer's opinion? And then, if so, prejudicial or whatever the issue might be ...?" Defendant's attorney replied, "Yes, Your Honor, and throughout the workup and all of the four workups. [¶] ... [¶] ... It pervades all of them." Counsel was referring to a 70-page document marked "Court's Exhibit 1A," which contained data compiled by Officer Strand on defendants' criminal histories and gang backgrounds, one "workup" for each defendant. The 19-page workup for defendant contained most of the previously summarized hearsay at issue in this appeal, including

the contents of police reports and the July 2014 jail kite. The trial court reviewed this material with the parties in detail, and the record contains the judge's handwritten notes on each piece of evidence. Some of the evidence was excluded, but much of it was ruled admissible.

### 2. Analysis

"[A] motion in limine to exclude evidence is a sufficient manifestation of objection to protect the record on appeal when it satisfies the basic requirements of Evidence Code section 353, i.e.: (1) a specific legal ground for exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context. When such a motion is made and denied, the issue is preserved for appeal." (*People v. Morris* (1991) 53 Cal.3d 152, 190, 279 Cal. Rptr. 720, 807 P.2d 949, italics omitted, disapproved on an unrelated issue in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1, 38 Cal. Rptr. 2d 394, 889 P.2d 588.)

The codefendant's timely motion in limine, in which defendant joined, was directed at anticipated hearsay in the gang expert's basis testimony. The particular body of evidence was identified at the motion hearing. The moving papers discussed *Crawford*, raised issues regarding the admissibility of testimonial hearsay, and challenged the legal fiction that jurors do not consider the truth or falsity of hearsay introduced through expert testimony. The motion further stated, "Trial courts have long had discretion to limit or exclude any hearsay basis evidence, whether or not testimonial, under Evidence Code section 352 ...." Counsel plainly sought to exclude the hearsay on grounds set forth in Evidence Code section 352, but this was because all parties understood the trial court was bound by *Gardeley*. Thus, the only viable argument for exclusion was undue prejudice and/or juror confusion. (See *Sanchez, supra*, 63 Cal.4th at p. 679.) For our purposes, what matters is defendant's expression of disagreement with *Gardeley* because of *Crawford* and pursuant to the reasoning in *Hill*.

In light of the points raised in limine, we conclude the issues underlying defendant's *Sanchez* claim were adequately preserved for review. (Cf. *Blessett, supra*, 22 Cal.App.5th at pp. 921-923 [appellant's motion in limine was "generic in nature," "not specific to the gang evidence," and "did not specifically reference the gang expert's anticipated testimony" or *Crawford*].) Incidentally, the circumstances also support defendant's futility argument. The People and the trial court were aware of potential *Crawford* issues and of case law challenging the rationale of *Gardeley* (i.e., *Hill, supra*, 191 Cal.App.4th at pp. 1129-1137). Both proceeded in lockstep with the *Montiel/Gardeley* paradigm. At the beginning of Officer Strand's expert testimony, the jury was given a *Montiel*-based limiting instruction. Before eliciting hearsay contained in the police reports, the prosecutor asked Officer Strand, "Are police reports commonly relied upon by experts in your field?" During defendant's cross-examination, after the prosecutor questioned him about the police reports, the trial court reiterated, "[T]hose were admitted not for the truth, but for the opinion of the officer."

Finally, we note defendant alternatively alleges ineffective assistance of counsel based on a failure to preserve issues for appellate review. Were we otherwise inclined to accept the People's forfeiture argument, the merits of the *Sanchez* claim would be evaluated in a deficient performance analysis.

**D. Admissibility**

*1. Predicate offenses testimony*

There is a split of authority regarding whether a gang expert's testimony about predicate offenses entails "case-specific facts" as defined by *Sanchez*. Some courts believe such evidence should be classified as "general background information" and thus treated as subject matter about which a qualified expert may relate hearsay. (E.g., *Blessett, supra*, 22 Cal.App.5th at pp. 943-945; *People v. Vega-Robles* (2017) 9 Cal.App.5th 382, 411, 224 Cal. Rptr. 3d 19.) The opposing view holds that facts related to predicate offenses are necessarily case specific. (*People v. Lara* (2017) 9 Cal.App.5th 296, 337, 215 Cal. Rptr. 3d 91; *People v. Ochoa* (2017) 7 Cal.App.5th 575, 583, 588-589, 212 Cal. Rptr. 3d 703.)

Defendant argues Officer Strand's hearsay testimony about the predicate offenses was case specific and inadmissible. The People disagree. It is unnecessary to resolve this issue because any error was clearly harmless.

The predicate offenses requirement is part of the People's burden to show the existence of a criminal street gang. (§ 186.22, subds. (a), (e)-(f); see *People v. Vasquez* (2016) 247 Cal.App.4th 909, 922, 202 Cal. Rptr. 3d 743 ["'The existence of a criminal street gang is unquestionably an element of both the enhancement and the substantive offense'"].) The fact the Norteños are a criminal street gang was undisputed at trial. Officer Strand also had independent knowledge of two qualifying felonies, which is the minimum number required by the statute. (§ 186.22, subd. (e).) Moreover, the charged offenses qualified as additional predicates. (*People v. Tran* (2011) 51 Cal.4th 1040, 1046, 126 Cal. Rptr. 3d 65, 253 P.3d 239.)

Officer Strand was present when an individual named Omar Valdez was arrested for carrying a loaded firearm, which is a qualifying felony (§ 186.22, subd. (e)(33)), and he heard Valdez "admit[] to being [a] Northern gang member[]." He personally investigated a murder committed by a Norteño named Armando Herrera and served as the gang expert in that case. Murder is another qualifying offense (§ 186.22, subd. (e)(3)). We reject defendant's argument that only eyewitnesses to a crime can possess the type of "personal knowledge" contemplated by *Sanchez*. (*Sanchez, supra*, 63 Cal.4th at p. 676.) Since the expert had personal knowledge of these two crimes, his testimony was admissible regardless of whether the subject matter was case specific.

Officer Strand's testimony regarding five other predicates was based on the contents of police reports. Even assuming the evidence was inadmissible, defendant's prejudice argument is weak and unconvincing. He complains the "grisly details" of these crimes likely inflamed the jury's passions "by emphasizing the Norteño gang's vicious and

dangerous nature." The predicates consisted of two burglaries, an assault with a firearm against a Sureño gang member, and two stabbings (one of a Norteño dropout, the other of a Sureño). Summaries of the underlying circumstances were brief, and it was hardly the only evidence of the gang's propensity for violence. Officer Strand's admissible testimony repeatedly highlighted Norteño involvement in violent crime, including his list of the gang's primary activities, which included murder and torture. Defendant testified one of his own relatives was "murdered by a Northerner." Viewing the record as a whole, the challenged evidence could not have affected the verdicts.

### 2. Police reports, booking statements, and miscellaneous hearsay

The People appropriately concede the police reports concerning defendant, for which Officer Strand had no personal knowledge of the matters asserted therein, constituted inadmissible testimonial hearsay. The same concession is made with regard to the police reports concerning codefendant Delacruz. As for the incriminating booking statements and Officer Strand claiming to have heard defendant was the leader of a Norteño subset, the People submit this evidence was inadmissible under state law but not testimonial. The People further acknowledge the mix of state and federal hearsay errors must be collectively evaluated for prejudice under the *Chapman* standard. (*People v. Martinez, supra*, 19 Cal.App.5th at p. 861.) Therefore, it is unnecessary to determine whether the booking statements and other hearsay admitted in violation of state law were also testimonial.

### 3. Jail kites

The People concede the July 2014 kite regarding defendant's placement in a Norteño housing unit "may have violated state hearsay law under *Sanchez*." We conclude the kite itself and Officer Strand's testimony relating its contents were both inadmissible hearsay. The evidence consisted of extrajudicial statements offered for their truth and not subject to a recognized hearsay exception.

The parties disagree about the admissibility of testimony regarding the other alleged kite. Officer Strand initially testified, "We have evidence Nuestra Familia member Jose Velez, they call him Cisco[,] [who's] from Delano and became a member of the Nuestra Familia and sent another kite to another Norteno in Delano with orders to form a squad to shut down drug houses and to tax the existing drug houses." Similar testimony was given to explain the basis for his opinion about the crimes in this case being committed at the direction of the Norteño gang.

The People characterize the evidence as "background information" rather than assertions of case-specific facts. The *Sanchez* opinion "does not call into question the propriety of an expert's testimony concerning background information regarding his knowledge and expertise and premises generally accepted in his field." (*Sanchez, supra*, 63 Cal.4th at p. 685.) Instead, it expressly "restores the traditional distinction between an expert's testimony regarding background information and case-specific facts." (*Ibid.*) Experts are given latitude to convey hearsay regarding the former, but not the latter. (*Id.* at p. 676.) The following example illustrates the distinction: "That an associate of the

defendant had a diamond tattooed on his arm would be a case-specific fact that could be established by a witness who saw the tattoo, or by an authenticated photograph. That the diamond is a symbol adopted by a given street gang would be background information about which a gang expert could testify. The expert could also be allowed to give an opinion that the presence of a diamond tattoo shows the person belongs to the gang." (*Sanchez*, at p. 677.)

The concept of a gang-related "tax" and the fact Norteños tax drug dealers falls into the category of general background information. The same is not true of Officer Strand's testimony about a particular high-ranking Nuestra Familia member sending a kite to a Norteño member in Delano ordering him to form a "squad" to shut down nontaxpaying "dope houses." By definition, the testimony was case-specific hearsay because it introduced out-of-court statements for the truth of the matter asserted, and the information related "to the particular events and participants alleged to have been involved in the case being tried." (*Sanchez, supra*, 63 Cal.4th at p. 676.) Defendant and his accomplices were portrayed as being part of the alleged "squad" and having committed the charged offenses at the direction of a higher ranking gang member. Therefore, the testimony was inadmissible.

### 4. Rebuttal testimony

Defendant contends Officer Strand introduced inadmissible hearsay by testifying about defendant's sister's police reports and booking statements. The police reports contained information regarding a four-dot tattoo on her left wrist. The expert's testimony indicates he looked at a booking photograph in which the tattoo was visible. Photographs are "demonstrative evidence, depicting what the camera sees. [Citations.] They are not testimonial and they are not hearsay." (*People v. Cooper* (2007) 148 Cal.App.4th 731, 746, 56 Cal. Rptr. 3d 6.) Testimony as to what Officer Strand actually saw in the photo was admissible. Recital of the arresting officer's handwritten notation of "four dots" was inadmissible hearsay, as was the allegation of her being arrested for "forgery and counterfeit."

The sister's admission of gang association in her booking statement was admissible for impeachment purposes if it was inconsistent with her trial testimony. (Evid. Code, § 1235.) She claimed to have denied gang membership during a jail classification interview. She further testified to requesting segregation from "Southern gangs" after being asked, "[D]o you have to be separated from anybody?" According to the rebuttal testimony, she was "classified as a North when asked, do you belong or associate with any gang in or out of jail?" Under these circumstances, the booking statement appears to have been properly admitted. However, testimony regarding the alleged "AKA" did not contradict her trial testimony, as she had admitted to being called "Sad Eyes" as a teenager.

Humberto Ortiz denied ever being known as "Enemy." He also denied claiming "affiliation with the North" following a 2005 arrest, vaguely explaining he had requested "to be put with Northerners for my own protection." Ortiz was then asked, "In 2012, did you hang out with Northerners?" He replied, "No, sir." On rebuttal, Officer Strand

testified to reviewing unspecified documents indicating "Enemy" was "his moniker when he was arrested in July of 2005." The testimony continued: "[H]e was classified as North at CRF, the same question, do you belong to or associate with any gang in or out of jail? If yes, who? And the answer was North. And I also reviewed a field interview from 2012 where he was contacted with two gang members[:] Jessie Ortiz[,] who I know is a Norteno from first-hand experience[,] as well as Joel Becerra, ... who I also know as a Norteno, and they were all in the same car." In light of the surrounding circumstances, we conclude this rebuttal testimony was admissible for impeachment.

## E. Prejudice

The *Chapman* standard requires reversal unless the People establish "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman, supra*, 386 U.S. at p. 24.) "'To say that an error did not contribute to the ensuing verdict is ... to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'" (*People v. Neal* (2003) 31 Cal.4th 63, 86, 1 Cal. Rptr. 3d 650, 72 P.3d 280.) "[T]he focus is what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is 'whether the ... verdict actually rendered in *this* trial was surely unattributable to the error.'" (*Ibid.*; accord, *People v. Quartermain* (1997) 16 Cal.4th 600, 621, 66 Cal. Rptr. 2d 609, 941 P.2d 788.)

We begin with the gang-related verdicts. The People maintain all errors were harmless because "[t]here was an abundance of properly-admitted [*sic*] evidence showing that appellant was a Norteño gang member." The argument is misguided. Defendant readily admitted he was a gang member. He testified to being an *inactive* Norteño, which supposedly meant he no longer actively participated in the gang and his criminal activities were done for personal reasons. The question, therefore, is whether the improperly admitted hearsay could have materially undermined his defense in the eyes of the jury.

Defendant allegedly became an inactive Norteño at the age of 21, placing the date in or around 2005. In approximately 2007, he covered up his five-point star tattoo and tried dropping out of the gang but was counseled by a higher ranking member to simply remain inactive. By 2012, he was working with the sheriff's department as a confidential informant, which was a violation of the "14 bonds" and further demonstrated his lack of commitment to the gang.

Had the jury not been exposed to the police reports, their knowledge of defendant's criminal history between 2005 and 2014 would have been limited to a 2010 conviction for second degree burglary, which he preemptively acknowledged on direct examination. The jury also knew he was on probation as of 2013. Because of the police reports, the jury learned defendant was suspected of committing multiple crimes with Norteño gang members in 2007, 2008, and 2013, the last of which involved the stabbing of a Norteño dropout. This was totally inconsistent with defendant's claimed inactive status.

28

According to defendant's testimony, inactive Norteños "might commit crimes, but they don't commit them for the benefit of a gang, they commit it for themselves." In her interview with Officer Strand, witness S.R. told him an "older Northerner" had said defendant and his accomplices "acted on their own," i.e., not at the direction or for the benefit of a gang, because the Norteños would not have ordered or sanctioned a home invasion robbery. Defense counsel made a point to question her about this at trial. Victim 2 received the same information, which he cited as a reason for not initially reporting the crime to police. At trial, he testified to believing "they weren't supposed to do this" and confirmed his inclination to "just let family take care of family," i.e., leave it to the Norteño gang to discipline defendant for the robbery.

Statements attributed to the unnamed Northerner were hearsay, but it was admitted without objection by the People. The evidence supported the defense case, yet its probative value was likely diminished by inadmissible testimony about a kite from a Nuestra Familia member instructing Norteños in Delano to "form a squad to tax dope houses and to shut down [nontaxpaying] dope houses." The People actually rely on this evidence to argue harmless error, claiming "the crimes committed in this case were part of an intentional gang effort to monopolize the drug trade in Delano by taxing people who sold drugs and preventing non-tax-payers from selling drugs."

The July 2014 kite, which the People generally concede was inadmissible, was another critical piece of evidence. The jury deliberated for several hours over the course of two days, making an early request for "1. Det. Strands Power Point (Kite) [and] 2. [R.R.'s] testimony." After being told the Power Point presentation was not in evidence, the jury made a second request: "Readback of Det Strand's testimony concerning the kite naming [defendant]."

"Juror questions and requests to have testimony reread are indications the deliberations were close." (*People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295, 280 Cal. Rptr. 584.) For whatever reason, the jury found the July 2014 kite to be significant. A logical explanation is how it contrasted with defendant's definition of an inactive Norteño: "A dropout [is] not a Norteno at all." "A ... dropout basically goes into protected custody. An active Norteno participates in all the gang functions on the streets and behind the walls. An inactive Norteno participates in none of the functions on the streets or behind the walls[,] [¶] ... [¶] [b]ut is still in general population." If defendant was being truthful, his arrest on July 13, 2014, would have resulted in him staying in "general population" and not participating in any Norteño gang functions. The kite showed he was placed in a Norteño housing unit and welcomed "with open arms" after clearing the gang's internal background check. The kite also identified "home invasion" as a pending charge, further weakening the evidence of such conduct being prohibited by the gang. In any event, the jury definitely factored the hearsay into its analysis.

We agree there was ample evidence to support the gang charges. However, the proper focus is "the basis on which 'the jury *actually rested* its verdict.'" (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279, 113 S. Ct. 2078, 124 L. Ed. 2d 182.) "The test is not whether a hypothetical jury, no matter how reasonable or rational, would render the same verdict in the absence of the error, but whether there is any reasonable possibility

29

that the error might have contributed to the [verdicts] in this case. If such a possibility exists, reversal is required." (*People v. Lewis* (2006) 139 Cal.App.4th 874, 887, 44 Cal. Rptr. 3d 403.) As demonstrated by its questions, the "inactive Norteño" defense gave this jury pause. Given the amount of inadmissible hearsay on the issue and how damaging it was to the defense theory, we cannot conclude the errors were harmless beyond a reasonable doubt. Therefore, the gang participation convictions and related enhancements must be reversed.

Defendant contends the prejudice extended to all counts. First, he argues hearsay concerning the defense witnesses "unfairly eviscerated" their credibility, making the jury less inclined to accept the alibis for both robberies. Second, he contends the police reports showed he "had a bad character, supporting an impermissible propensity inference," i.e., his propensity to commit violent crimes. We are not persuaded.

As explained, there was no error in the impeachment of defendant's former brother-in-law, Humberto Ortiz. Nevertheless, we note Ortiz had no knowledge of defendant's whereabouts during either robbery. He merely testified to seeing defendant and his sister leave their house around 5:00 a.m. on July 12, 2014, and return home sometime between 3:30 and 4:00 in the afternoon. Ortiz also admitted to being housed with Northerners following a prior arrest. Insofar as any error could be shown, it was undoubtedly harmless.

Admissible evidence showed defendant's sister previously acknowledged a Norteño affiliation and had the characteristic four-dot tattoo on her wrist. The inadmissible hearsay concerned her arrest for "forgery and counterfeit" in 2006. However, she admitted on direct examination to misdemeanor convictions in 2011 of providing false information to a police officer and receiving stolen property. The latter crimes both involve moral turpitude and dishonesty. (*People v. Steele* (2000) 83 Cal.App.4th 212, 221-222, 99 Cal. Rptr. 2d 458 [false information to a police officer]; *People v. Rodriguez* (1986) 177 Cal.App.3d 174, 178-179, 222 Cal. Rptr. 809 [receiving stolen property].)

Defendant's sister also proved herself untrustworthy on the witness stand. Amid questioning about the employment records for the date of the first robbery, she denied ever having signed in for her brother at a job site. Moments later, the People introduced evidence showing she had signed for him the previous day, July 11, 2014. On top of everything else, her testimony carried less weight because of her relationship to defendant. (Accord, *People v. James* (1976) 56 Cal.App.3d 876, 886, 128 Cal. Rptr. 733 ["Relationship of a witness to others involved in the case is a material fact bearing on the credibility of the witness"]; *People v. Walker* (1957) 154 Cal.App.2d 143, 150, 315 P.2d 740 [jury may consider witness's "family relationship and the likely bias in [defendant's] favor because of it"].) The verdicts were certainly not affected by inadmissible portions of the rebuttal testimony.

The police reports negatively reflected on defendant's character, but the same conclusions would have been drawn from defendant's own admissions and other testimony. Defendant acknowledged two prior felony convictions of second degree

burglary, as well as a "DUI." He admitted prior acts of theft, stating, "Most of the stuff that I have stolen in my life is drugs." He detailed his involvement in a conspiracy to rob victim 1 and M.Q. of several pounds of methamphetamine. The jury also heard victim 1's account of how defendant threatened him with a knife during an earlier incident. In addition, defendant's work as an undercover drug informant was inherently deceitful.

Defendant's attempt to analogize this case to *People v. Ramirez* (2016) 244 Cal.App.4th 800, 198 Cal. Rptr. 3d 318 (*Ramirez*) is unavailing. In *Ramirez*, "irrelevant but highly inflammatory gang evidence was admitted which deprived [the appellants] of their due process rights to a fair trial on ... attempted murder and assault charges." (*Id.* at p. 803.) The prejudice stemmed from the erroneous denial of a section 995 motion to dismiss gang participation charges and enhancements at the preliminary hearing stage. In other words, the gang evidence in the appellants' trial had no relevance and should have been excluded entirely. "[C]onflicting trial testimony about the incident presented the jury with two plausible factual scenarios.... [¶] ... But there [was] a substantial likelihood the jury's evaluation of [the appellant's] credibility was colored by the gang evidence." (*Id.* at p. 821.)

In this case, four eyewitnesses identified defendant as a participant in the robberies. Defendant's history of gang membership was relevant and admissible. His credibility was damaged by his own admissions of prior felony convictions and a criminal lifestyle, including extensive involvement in the purchase and sale of illegal drugs. The alibis offered at trial were plagued with inconsistencies and implausibility, and further overshadowed by the evidence of witness intimidation. Even with employment records purporting to show he was at work on the date of the first robbery, the jury convicted him of all related charges except carrying a loaded firearm.

In *Sanchez*, the erroneous admission of testimonial hearsay was found prejudicial only in relation to the gang charges; the judgment was affirmed with respect to other convictions. (*Sanchez, supra*, 63 Cal.4th at p. 700.) The same disposition is appropriate here. For the reasons stated, and based on the record as a whole, we conclude the individual and cumulative impact of the inadmissible hearsay was harmless beyond a reasonable doubt as to the convictions on all counts except 7 and 19.

Reversal is required of the active gang participation convictions, all findings under section 186.22, subdivision (b), and all firearm enhancements. The firearm enhancements were based on section 12022.53, subdivision (e)(1), pursuant to which the enhancements under subdivisions (b) through (d) do not apply to a principal who is not found to have personally used a firearm unless the offense is proven to be gang related for purposes of section 186.22, subdivision (b). There was no finding, or even proof, of defendant's personal use of a firearm in the second robbery. Victim 2 identified Delacruz as the gunman and the other witnesses did not recall seeing any weapons. There was evidence defendant personally used a firearm in the first robbery, but, as the People concede, the jury made no such finding. The People's closing argument even noted it was unnecessary to determine which individual was armed with the gun. Given these circumstances, reversal of the gang findings necessarily requires

us to vacate the firearm enhancements. (*People v. Cornejo* (2016) 3 Cal.App.5th 36, 43, 50, 207 Cal. Rptr. 3d 366.)

Defendant understands he may be retried on the reversed counts and enhancements. This is due to the sufficiency of the evidence, which he does not contest. "[W]here the evidence offered by the State and admitted by the trial court—whether erroneously or not—would have been sufficient to sustain a guilty verdict, the Double Jeopardy Clause does not preclude retrial." (*Lockhart v. Nelson* (1988) 488 U.S. 33, 34, 109 S. Ct. 285, 102 L. Ed. 2d 265; accord, *People v. Story* (2009) 45 Cal.4th 1282, 1296-1297, 91 Cal. Rptr. 3d 709, 204 P.3d 306.)

Lopez, 2018 Cal. App. Unpub. LEXIS 7177, at *31-71.

     *a.    Legal Standard*

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const ., Amend. VI. The Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant . . . had a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 53-54 (2004); Davis v. Washington, 547 U.S. 813, 821 (2006). The Confrontation Clause applies only to "'witnesses' against the accused, i.e., those who 'bear testimony.'" Crawford, 541 U.S. at 51 (citation omitted); Davis, 547 U.S. at 823-24. "'Testimony,' in turn, is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Crawford, 541 U.S. at 51 (citation and some internal punctuation omitted); Davis, 547 U.S. at 824. As the Davis court explained:

[a] critical portion of [*Crawford's*] holding . . . is the phrase "testimonial statements." Only statements of this sort cause the declarant to be a "witness" within the meaning of the Confrontation Clause. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.

Davis, 547 U.S. at 821 (citation omitted). Thus, nontestimonial statements do not implicate the Confrontation Clause. Giles v. California, 554 U.S. 353, 376 (2008). Moreover, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Crawford, 541 U.S. at 59 n. 9. Additionally, a Confrontation Clause violation is subject to harmless error analysis. Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986). A

Confrontation Clause violation is harmless, and does not justify habeas relief, unless it had substantial and injurious effect or influence in determining the jury's verdict. Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).

"Although Crawford did not define 'testimonial' or 'nontestimonial,' it made clear that the Confrontation Clause was concerned with 'testimony,' which 'is typically [a] solemn declaration or affirmation made for the purpose of establishing or proving some fact,' and noted that '[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.'" Delgadillo v. Woodford, 527 F.3d 919, 927 (9th Cir.2008) (quoting Crawford, 541 U.S. at 51). Subsequent Supreme Court cases have suggested that a statement is "testimonial" if its declarant knew, or should have known, that its primary utility was to provide evidence of the defendant's unlawful conduct for use in his prosecution or a criminal investigation into past events. See Williams v. Illinois, 567 U.S. 50, 82 (2012) ("The abuses that the Court has identified as prompting the adoption of the Confrontation Clause shared the following two characteristics: (a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions."); Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009) (opining that a statement is "testimonial" if it was made for an "evidentiary purpose" and "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial") (internal citation and quotation marks omitted).

*b.    Analysis*

The state court applied the correct legal standard under the Sixth Amendment by applying Crawford, 541 U.S. 36. Thus, the only question is whether the state court's adjudication is objectively unreasonable.

First, the statements relied upon by the gang expert as to the non-gang related charges were not testimonial in nature.[2] The gang expert in this case relied on police reports and independent knowledge

---

[2] The Fifth DCA found that certain gang expert testimony constituted inadmissible testimonial hearsay, including testimony about several police reports. In light of its prejudicial nature as to the gang-related convictions and enhancements, the Fifth DCA reversed those particular convictions and true findings. Specifically, the Fifth DCA reversed the active gang participation convictions, all findings under section 186.22, subdivision (b), and all firearm enhancements.

of two qualifying felonies. The Confrontation Clause applies only to "witnesses against the accused, i.e., those who bear testimony," therefore, it could apply only to the oral statements relied upon by the expert. Crawford, 541 U.S. at 51. Here, there were no such oral statements at issue that could be considered testimonial in nature, in that they did not have resemblance to formalized statements such as affidavits, depositions, prior testimony, or confessions. Williams, 132 S.Ct. at 2242. Thus, the statements relied upon by the gang expert did not violate the Confrontation Clause.

In addition, even if considered testimonial in nature, the statements were not offered for their truth but only to inform the gang expert's opinion. For this reason as well, the gang expert's opinion could not violate the Confrontation Clause.

Moreover, there is no clearly established Supreme Court precedent finding a violation of the Confrontation Clause resulting from the admission of an expert's opinion based on hearsay statements. In Williams, a majority of the Supreme Court found that the laboratory results from a nontestifying technician which informed the expert witness were not testimonial in nature and therefore did not violate the Confrontation Clause. Williams, 132 S.Ct. at 2240, 2242-43. Also, a plurality concluded that the laboratory results were admitted for the nonhearsay purpose of "illuminating the expert's thought process" rather than establishing the truth of the matter asserted. Id. at 2240. Because the Supreme Court has provided no clear answer to this question, "it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008).

Even if there was error, the state court reasonably concluded that the admission of the gang expert's testimony did not have a "substantial and injurious effect or influence on the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). As Respondent points out, there was substantial evidence to support the non-gang related charges independent of the expert's testimony. First, the state court reasonably concluded that there was no error in the impeachment of Petitioner's former brother-in-law, Humberto Ortiz. Lopez, 2018 Cal. App. Unpub. LEXIS 7177, at *66-67. The state court noted that Ortiz had no knowledge of Petitioner's whereabouts during either robbery and

Yet the Fifth DCA also found that the inadmissible testimonial hearsay was harmless beyond a reasonable doubt as to the remainder of the underlying convictions (i.e., as to the convictions on all counts except 7 and 19).

Ortiz admitted to being housed with Northerners following a prior arrest. Id. at *67. Additionally, the state court reasonably concluded that the verdicts were not affected by inadmissible portions of rebuttal testimony. Specifically, the state court found that admissible evidence showed Petitioner's sister previously acknowledged a Norteno affiliation, had the characteristic four-dot tattoo on her wrist, prior convictions for moral turpitude and dishonesty, and that she had signed in for Petitioner at a job site and denied doing so when she was on the witness stand. Id. at *67-68.

Additionally, it was not unreasonable for the state court to find that although the police reports negatively reflected on Petitioner's character, the same conclusions would have been drawn from Petitioner's own admissions and other testimony; for example, his acknowledged prior convictions and criminal activity, his deceitful work as an undercover drug informant, his recorded phone calls from jail, his attempts to get witnesses to retract their statements, and his incomplete and inconsistent alibis. Id. at *16-*27, *68-69. As noted by the state court, four eyewitnesses identified Petitioner as a participant in the robberies. Id. at *69. The state court reasonably found that Petitioner's history of gang membership was relevant and admissible. Id. The state court discussed Petitioner's credibility was damaged by his own admissions of prior felony convictions and a criminal lifestyle, including extensive involvement in the purchase and sale of illegal drugs. Id. Also, the state court reasonably found that the alibis offered at trial were plagued with inconsistencies and implausibility, and further overshadowed by the evidence of witness intimidation. Id. at *69-70. Finally, the jury was specifically instructed that it could not conclude from the evidence of gang activity that the Petitioner is a person of bad character or that he has a disposition to commit crime, and "[a] jury is presumed to follow its instructions." Weeks v. Angelone, 528 U.S. 225, 234 (2000); (Doc. 17-9 at 183.)

Therefore, the Petitioner is not entitled to habeas relief because the state court decision as to the remaining convictions was not contrary to or an unreasonable application of clearly established Supreme Court precedent. And even if error occurred, it could have had no effect on the jury's verdict. The claim should be denied.

### 2. Ineffective Assistance of Counsel

Petitioner asserts his trial attorney committed a constitutionally deficient performance for failing to object to portions of Officer Strand's interview with S.R. In the last reasoned decision, the

Fifth DCA denied the claims as follows:

Defendant accuses his trial attorney of constitutionally deficient performance for failing to object to portions of Officer Strand's interview with S.R. The nearly hour-long recording was used to impeach S.R.'s trial testimony. Defendant complains of the jury hearing allegedly irrelevant and inflammatory statements.

**A. Background**

Defendant was a childhood friend of S.R.'s brother-in-law. Her brother-in-law died as a teenager from an accidental self-inflicted gunshot wound. In the recorded conversation, S.R. alleged defendant's sister, Sandra Estrada, "is the one that gave my brother-in-law the gun that killed himself." She added, "Ya know, if he was never given that gun, that kid would [have] never shot himself playing around with it .... [I]t's beyond me why [my husband] would still associate with [defendant's family]. Oh, because they're not gangsters? No, they're all that way. Their—it's [bred] into them from the beginning. It goes from the mom down ...."

Explaining her reluctance to testify against defendant, S.R. said, "I'm not afraid, I just worry because of my them—that's my kids, you know? Not them, but—but there is no—there is no boundaries for those—them, you know? [¶] ... [¶] ... There's not—there's not any boundaries in regards to my—my family. [¶] ... [¶] ... 'Cause they wouldn't have given my little brother-in-law a gun be—you know what I mean, a 15-year-old a gun, you know, they—they didn't care, you know?" "[T]hese guys know my kids. They, you know, they wouldn't—and it's not just him being in jail. He's got a brother. He's got sisters, he's got, you know, he's got other people in his family...."

Officer Strand encouraged S.R. to participate in the case despite her concerns: "I'm gonna speak in very big terms[.] [W]hen people do heinous crimes[,] [¶] ... [¶] ... [t]hey do it because they probably got away with it before. [¶] ... [¶] ... And they probably think they're gonna get away with it again. [¶] ... [¶] ... And I know that, again, generally speaking, gangs operate on that. [¶] ... [¶] ... They feed off that. They feed off of people not wanting to cooperate. And I know that our job, as law enforcement officers, ... is so much more effective when we get cooperation. [¶] ... [¶] ... And as a result, the suspects go to prison, and then they don't commit this crime again."

**B. Analysis**

To prevail on a claim of ineffective assistance of counsel, an appellant must show "(1) counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficiencies resulted in prejudice." (*People v. Centeno* (2014) 60 Cal.4th 659, 674, 180 Cal. Rptr. 3d 649, 338 P.3d 938.) "Prejudice requires 'a reasonable probability that a more favorable outcome would have resulted ..., i.e., a probability sufficient to undermine confidence in the outcome.'" (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241, 69 Cal. Rptr. 2d 784, 947 P.2d 1321.) An appellate court may forgo the analysis of counsel's performance if, as here, it is easier to dispose of the claim for lack of prejudice. (*Ibid.*)

Defendant argues Officer Strand expressed opinions on the topic of criminal propensity. He posits the jury viewed those statements as tending to "support the improper inference that [defendant] committed the charged crimes ... [and] that, regardless of his actual guilt, the public would be served by putting [him] in prison." Defendant also contends S.R.'s remarks about his family members "improperly impugn[ed] the defense witnesses' credibility."

The People characterize Officer Strand's statements as "general truisms." We tend to

36

agree. Furthermore, insofar as he was expressing opinions based on specialized knowledge, he related substantially the same viewpoints in his trial testimony. The argument regarding the defense witnesses' credibility is unpersuasive for the reasons previously discussed. We also note S.R.'s comments pertained to defendant's mother and his sister Sandra, neither of whom testified at trial. The claim fails for lack of prejudice, regardless of whether counsel's performance fell below an objective standard of competence.

Lopez, 2018 Cal. App. Unpub. LEXIS 7177, at *78-81.

### a. Legal Standard

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test. Strickland v. Washington, 466 U.S. 668, 687-88 (1984); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir. 1986); see also Penson v. Ohio, 488 U.S. 75 (1988) (holding that where a defendant has been actually or constructively denied the assistance of counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S. at 687-88. Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance. Knowles v. Mirzayance, 556 U.S. 111, 122 (2009). Accordingly, the question is not whether a federal court believes the state court's determination under the Strickland standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123. In effect, the AEDPA standard is "doubly deferential"

because it requires that it be shown not only that the state court determination was erroneous, but also that it was objectively unreasonable. Yarborough v. Gentry, 540 U.S. 1, 5 (2003). Moreover, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")

   b.   *Analysis*

   Petitioner argues that his trial counsel failed to object to portions of Officer Strand's interview with S.R. when the nearly hour-long recording was used to impeach S.R.'s trial testimony. Petitioner complains of the jury hearing allegedly irrelevant and inflammatory statements. However, based on the record, the choices made by counsel appear reasonable. As Respondent contends, in light of all the admissible evidence showing that Petitioner and his family members were affiliated with the gang, it would not have been unreasonable for counsel to conclude that there was no reason to object to the witness's statements about their gang affiliation. Additionally, it is entirely speculative that any objections by counsel would not be futile.

   Moreover, Petitioner failed to establish that he suffered prejudice. As the Fifth DCA noted, the statements made by the officer were "general truisms," and insofar as he was expressing opinions based on specialized knowledge, he related substantially the same viewpoints in his trial testimony. Lopez, 2018 Cal. App. Unpub. LEXIS 7177, at *80-81. Petitioner failed to demonstrate that there is a reasonable probability that such evidence if introduced would undermine confidence in the outcome of the trial. Petitioner failed to show that counsel erred or that the error resulted in any prejudice. The claim should be rejected.

   3.   Miranda Violation

   Petitioner alleges a Miranda violation based on the admission of statements he made to Officer Strand during a probation compliance check. In the last reasoned decision, the Fifth DCA denied the claims as follows:

   Defendant alleges a *Miranda* violation based on the admission of statements he made to

Officer Strand during a probation compliance check. The merits of this claim do not affect our reversal for *Sanchez* error, but the dispute will likely recur if defendant is retried. It is thus appropriate to resolve the issue. (Accord, *People v. Wilson* (1992) 3 Cal.4th 926, 937, 13 Cal. Rptr. 2d 259, 838 P.2d 1212 ["For the guidance of the parties and the trial court on remand, ... we shall address several issues, raised on appeal, that are likely to recur on retrial"].)

### 1. Background

On October 14, 2013, Officer Strand and other law enforcement officials went to defendant's home to conduct an "AB 109 probation compliance check." They arrived at approximately 3:40 p.m. While other officers searched the residence, Officer Strand spoke with defendant in his front yard. He testified to the nature of their discussion:

"I brought up a case that was very recent ..., there was graffiti at a local park in large letters that said 187 law enforcement, and it was Norteno graffiti, and it also said 187 hits and smokey. Those are monikers for two Surenos in addition to a number of other graffiti markings that were Norteno related. The conversation was about that and those responsible for that particular crime. [¶] ... [¶]

"... Based on conversations with other officers, I know that [defendant] has a great deal of influence within the Norteno gang. And my conversation with him regarding that incident was not only to find out who was responsible, but also to ask him to bring those responsible forward, to use his influence to have those responsible to turn themselves [in to] me. [¶] ... [¶]

"... I asked [defendant] if he was ever going to ever stop being a Norteno, and he said, no. And I asked him, why he would never stop being a Norteno? I remember it very clearly that he said it was safer—he felt it was safer to stay inside the gang."

Officer Strand described the conversation as "respectful," "low key," "friendly," and "cooperative." He had not accused defendant of being involved in any crimes. On cross-examination, he opined the encounter was noncustodial: "[D]uring a probation search, the person on probation at the house, they are not in custody, but they are also not free to leave during the search. [¶] ... [¶] [W]e don't just let them walk away, and he didn't ask to walk away."

Defendant objected to the use of his statements at trial on grounds they were elicited via custodial interrogation without an advisement of his Fifth Amendment rights. The trial court overruled the objection: "As I see it ..., this really [isn't] an interrogation and I think [the prosecutor] hit it on the head, and I think this is just a simply an investigation, and this was an investigation going on apart from the fact that they were doing this ... probation compliance check .... I will find that there was no requirement of *Miranda*."

### 2. Analysis

"In reviewing *Miranda* issues on appeal, we accept the trial court's resolution of

disputed facts and inferences as well as its evaluations of credibility if substantially supported, but independently determine from undisputed facts and facts found by the trial court whether the challenged statement was legally obtained." (*People v. Smith* (2007) 40 Cal.4th 483, 502, 54 Cal. Rptr. 3d 245, 150 P.3d 1224.) Officer Strand's testimony was undisputed at the time of the trial court's ruling (defendant later claimed to have been misquoted). The trial court impliedly found the officer's testimony to be true, noting he and defendant appeared to have had a "polite conversation." We accept the factual findings and review the legal issue de novo.

When a defendant is subjected to custodial interrogation without being advised of his or her Fifth Amendment rights under *Miranda*, statements made during the interrogation cannot be used in the prosecution's case-in-chief. (*People v. Lessie* (2010) 47 Cal.4th 1152, 1162, 104 Cal. Rptr. 3d 131, 223 P.3d 3; *People v. Thornton* (2007) 41 Cal.4th 391, 432, 61 Cal. Rptr. 3d 461, 161 P.3d 3.) In this context, "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." (*Howes v. Fields* (2012) 565 U.S. 499, 508-509, 132 S. Ct. 1181, 182 L. Ed. 2d 17.) "Relevant factors include the location of the questioning [citation], its duration [citation], statements made during the interview [citations], the presence or absence of physical restraints during the questioning [citation], and the release of the interviewee at the end of the questioning [citation]." (*Id.* at p. 509.) "Interrogation consists of express questioning or of words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1224, 14 Cal. Rptr. 2d 702, 842 P.2d 1.)

Quoting *Thompson v. Keohane* (1995) 516 U.S. 99, 116 S. Ct. 457, 133 L. Ed. 2d 383, defendant argues the test for custody is whether a reasonable person would have "felt he or she was not at liberty to terminate the interrogation and leave." (*Id.* at p. 112.) The quote is accurate, but the next sentence of the opinion specifies "the ultimate inquiry": '[was] there a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' [Citation.]" (*Ibid.*) Put differently, a custodial situation does not arise unless a reasonable person would believe his or her freedom of action has been "curtailed to a 'degree associated with formal arrest.'" (*Berkemer v. McCarty* (1984) 468 U.S. 420, 440, 104 S. Ct. 3138, 82 L. Ed. 2d 317.)

Even in situations where police have effectuated a detention, investigatory questioning is not necessarily custodial interrogation. The *Berkemer* opinion states: "The ... noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*." (*Berkemer v. McCarty, supra*, 468 U.S. at p. 440.) In *People v. Tully* (2012) 54 Cal.4th 952, 145 Cal. Rptr. 3d 146, 282 P.3d 173, the California Supreme Court relied on *Berkemer* to conclude the appellant was not in custody when police questioned him about an unrelated vandalism incident while he was detained for a traffic violation. (*Tully*, at p. 983.)

In *Minnesota v. Murphy* (1984) 465 U.S. 420, 104 S. Ct. 1136, 79 L. Ed. 2d 409, the United States Supreme Court rejected a *Miranda* claim by an appellant who gave incriminating responses to questions from his probation officer during a scheduled

40

meeting. The opinion notes "the nature of probation is such that probationers should expect to be questioned on a wide range of topics relating to their past criminality." (*Id.* at p. 432.) "Custodial arrest is said to convey to the suspect a message that he has no choice but to submit to the officers' will and to confess." (*Id.* at p. 433.) "Since [the appellant] was not physically restrained and could have left the office, any compulsion he might have felt from the possibility that terminating the meeting would have led to revocation of probation was not comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator." (*Ibid.*)

In a similar context, *People v. Farris* (1981) 120 Cal.App.3d 51, 174 Cal. Rptr. 424 found the questioning of a parolee during a parole search to be custodial interrogation, reasoning "a prisoner released on parole ... [is] in constructive custody." (*Id.* at p. 55.) However, parole agents had first advised the parolee "that he was a suspect and that they intended to search his bedroom. The search uncovered items of jewelry resembling many of those taken in the burglary being investigated." The un-*Mirandized* questioning about those items followed. (*Id.* at p. 54.)

Here, defendant was temporarily detained under circumstances sufficiently analogous to those in cases like *Berkemer v. McCarty* and *People v. Tully*. The questioning occurred during a casual conversation in defendant's front yard in the middle of the day. He was unrestrained and engaged with Officer Strand voluntarily after the officer asked him if they could speak in private, i.e., apart from the other members of law enforcement who were present. The discussion was brief and nonaccusatory, and the detention ended soon afterward. The evidence does not suggest a coercive atmosphere or defendant's freedom of action being "curtailed to a 'degree associated with formal arrest.'" (*Berkemer v. McCarty, supra*, 468 U.S. at p. 440.) Therefore, we conclude he was not in custody for purposes of *Miranda*.

Lopez, 2018 Cal. App. Unpub. LEXIS 7177, at *71-78.

a. Legal Standard

The Fifth Amendment provides that "no person shall be compelled in any criminal case to be a witness against himself." A suspect subject to custodial interrogation has a Fifth Amendment right to consult with an attorney, and the police must explain this right prior to questioning. Miranda v. Arizona, 384 U.S. 436, 469-73 (1966). In Miranda, the United States Supreme Court held that "[t]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. To this end, custodial interrogation must be preceded by advice to the potential defendant that he or she has the right to consult with a lawyer, the right to remain silent and that anything stated can be used in evidence against him or

her. Id. at 473-74. These procedural requirements are designed "to protect people against the coercive nature of custodial interrogations." DeWeaver v. Runnels, 556 F.3d 995, 1000 (9th Cir. 2009).

Error in admitting statements obtained in violation of Miranda is deemed harmless for purposes of federal habeas review unless the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Ghent v. Woodford, 279 F.3d 1121, 1126 (9th Cir. 2002).

    *b.*    *Analysis*

In this case, the Fifth DCA applied clearly established Supreme Court precedent. Therefore, the question for this Court is whether that application was unreasonable. In light of the record, a rational jurist could conclude that the state court determination that Petitioner was not in custody at the time he made statements to Officer Strand was reasonable.

In determining whether suspects are "in custody" for Miranda purposes, the Supreme Court has considered whether they voluntarily approached or accompanied law officers understanding that questioning would ensue. See California v. Beheler, 463 U.S. 1121, 1125 (1982) (per curiam) (holding that defendant was not in custody when he agreed to accompany police to the station to answer questions and was allowed to leave immediately afterward); Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (holding that defendant was not in custody when he came to the station voluntarily and left "without hindrance" after 30 minutes of questioning). The Ninth Circuit has also found that suspects were not in custody where the circumstances included volunteering to answer law officers' questions. See, e.g., Hayden, 260 F.3d at 1066-67; United States v. Hudgens, 798 F.2d 1234, 1236-37 (9th Cir.1986). Here, the questioning occurred during a casual conversation in Petitioner's front yard in the middle of the day, and Petitioner engaged with Officer Strand voluntarily after the officer asked him if they could speak in private.

However, "[i]f an individual voluntarily comes to the police station or another location and, once there, the circumstances become such that a reasonable person would not feel free to leave, the interrogation can become custodial." Kim, 292 F.3d at 975. In this case, Petitioner was unrestrained and engaged with Officer Strand voluntarily after the officer asked him if they could speak in private, i.e., apart from the other members of law enforcement who were present. The discussion was brief and

42

nonaccusatory, and the encounter ended soon afterward. The evidence does not suggest a coercive atmosphere. A rational jurist could conclude that the encounter did not become so coercive that a reasonable person in Petitioner's circumstances would not have felt free to leave. See Hayden, 260 F.3d at 1066 (the defendant "was told explicitly that she was free to leave at anytime," her "ability to leave was [not] in any other way restrained," and "the duration of the interviews was [not] excessive [and] undue pressure was [not] exerted"); United States v. Gregory, 891 F.2d 732, 735 (9th Cir.1989) (the defendant "consented to be interviewed . . . and no coercion or force was used"); United States v. Hudgens, 798 F.2d 1234 (9th Cir. 1986) (the defendant voluntarily entered a police car to talk to the police and the agents did not use intimidating or coercive language during the interview). Therefore, under all of the circumstances, a rational jurist could conclude that Petitioner was not in custody for Miranda purposes.

Even if the state court erred, Petitioner fails to demonstrate prejudice. Although statements made to officers can be powerful evidence, excluding it in this case would not have altered the judgment since the evidence against Petitioner was overwhelming. Petitioner's own admissions provided the information obtained by Officer Strand during this encounter; for example, Petitioner admitted to prior involvement in gang activity, being a part of a graffiti "tagging crew," and becoming a Norteno gang member. Lopez, 2018 Cal. App. Unpub. LEXIS 7177, at *29-30. Therefore, any error could not have had a substantial and injurious effect on the verdict. The claim should be denied.

4. Cumulative Error

In his final claim for relief, Petitioner alleges that the cumulative effect of the errors deprived him of due process. "Multiple errors, even if harmless individually, may entitle a petitioner to habeas relief if their cumulative effect prejudiced the defendant." Ceja v. Stewart, 97 F. 3d 1246, 1254 (9th Cir. 1996) (citing Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir. 1992)); see also Karis v. Calderon, 283 F.3d 1117, 1132 (9th Cir. 2002). However, the Ninth Circuit has also recognized that where there is no single constitutional error, nothing can accumulate to the level of a constitutional violation. See Rup v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996). In this case, no errors occurred, and hence, there can be no cumulative error. Even if errors occurred, a reasonable factfinder could have found that the cumulative effect of the alleged errors did not prejudice Petitioner.

## IV.     RECOMMENDATION

Accordingly, the Court **RECOMMENDS** that the Petition for Writ of Habeas Corpus be **DENIED** with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within twenty-one days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within ten court days after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:   **November 1, 2019**          **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE